UNITED STATES of America,
Plaintiff–Appellee,

v.

John F. ROURKE, Defendant–Appellant.

Nos. 93–1731 and 93–2667.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1995.

Decided Jan. 22, 1996.

Barry Rand Elden, Chief of Appeals, Jay Fenton (argued), Office of U.S. Attorney, Criminal Appellate Division, Chicago, IL, for U.S.

Allen E. Shoenberger, Thomas Andereoli, Law Student (argued), Loyola University School of Law, Chicago, IL, for John Rourke.

Before BAUER, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

On May 19, 1983, a federal grand jury returned an indictment charging the defendant Rourke with one count of conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana, in violation of 21 U.S.C. § 846, and one count of conspiracy to import marijuana into the United States, in violation of 21 U.S.C. § 963. Rourke entered into a plea agreement and pled guilty to the charge of conspiracy to possess with intent to distribute marijuana. He was sentenced to three years probation and ordered to perform 250 hours of community service during each of those three years. In 1993, Rourke filed motions for relief pursuant to Federal Rule of Civil Procedure 60(b) and 28 U.S.C. § 2255, claiming that the United States Attorney for the Northern District of Illinois breached its plea agreement with him. The motions were denied and Rourke appeals. We AFFIRM.

## I. FACTUAL BACKGROUND

At the defendant's plea hearing, the facts of Rourke's crime were provided by the Assistant United States Attorney ("AUSA"). According to the AUSA, sometime during 1980 or 1981, Rourke, a licensed pilot, joined the Araneo Marijuana Organization, a drug conspiracy that acquired marijuana in Jamai-

ca, flew it to Florida, South Carolina, and North Carolina, and then distributed it to various co-conspirators, including ones in the metropolitan Chicago, Illinois area. Soon after Rourke joined the conspiracy, marijuana was obtained from Colombia, South America, flown to Coffeyville, Kansas, transported to Oklahoma and Arkansas by truck, and distributed throughout the country, including to Chicago, Illinois.

Rourke's role in the conspiracy involved the transportation of the drugs by plane, primarily arranging for the use, repair, and maintenance of the DC–6's the conspirators flew from Columbia to Kansas. The defendant also, on occasion, flew members of the drug conspiracy to various meetings that were held in furtherance of the conspiratorial scheme as well as participating in some of the meetings. At the plea hearing, Rourke stated that he never personally transported any marijuana.

The AUSA reached a plea agreement with Rourke who agreed to plead guilty to one count of conspiring to possess with intent to distribute in excess of 1,000 pounds of marijuana, while the conspiracy charge to import marijuana was dismissed. At the plea hearing, the AUSA stated that in exchange for the defendant's plea:

the *government* has agreed not to oppose [defense counsel's] recommendation for work release; however, it is part of the agreement that the *government* will oppose any recommendation for straight probation. Furthermore, the *government* has agreed not to take any action with respect to Mr. Rourke's pilot's license.

On May 2, 1984, the day after the plea hearing, the AUSA sent a letter to Rourke's attorney, confirming the terms of the plea agreement. The relevant part of the letter,

vis a vis this appeal, stated that *"[t]he United States Attorney* further agreed to take no action with respect to your client's aircraft pilot's license." (Emphasis added). In response to this letter, on May 11 Rourke's counsel made no specific reference to the provision referring to either the United States Attorney's language referencing "the government," or Rourke's pilot's license. He merely clarified his understanding of the work release portion of his client's sentence and also stated that "[i]n all other respects *I agree with the plea agreement as outlined in your letter."* (emphasis added). Subsequently, Rourke was convicted of additional drug-trafficking crimes in Virginia and Oklahoma.[1]

In a letter dated January 22, 1986, the Federal Aviation Administration ("FAA") advised Rourke that it would revoke his airman certificate (pilot's license). On July 18, 1986, Rourke received an official FAA Order of Revocation of his pilot's license, stating that "the Administrator has determined that you lack the degree of care, judgment, and responsibility required of the holder of a pilot certificate and that safety in air commerce and the public interest require the revocation of your airman certificate," effective August 11, 1986. The letter stated that the revocation was based on Rourke's conviction in the Northern District of Illinois for a violation of 21 U.S.C. § 846, and cited the Federal Aviation Act §§ 61.15(c) & 65.12(c) (conviction of any federal offense relating to marijuana is grounds for revoking airman certificates and mechanic certificates, respectively).

In April 1993, Rourke, with substitute counsel, filed a motion in district court (Fed. R.Civ.P. 60(b)),[2] arguing that the FAA's suspension of his license was a violation of his plea agreement, and requesting that the court compel the government (the FAA) to

---

1. Although the appellate record fails to reflect the facts or crime charged for which Rourke was convicted in Virginia, his attorney stated, during the Illinois proceedings, that the indictment was similar to the one in Illinois, and that the "alleged conspiracy in Norfolk covers the same time period as the conspiracy in this matter." However, Rourke also pled guilty to the following charges in Oklahoma on November 22, 1985: (1) importation of cocaine into Oklahoma in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); (2) travel from Oklahoma to Florida in violation of

the Travel Act, 18 U.S.C. § 1952; (3) use of a communication facility to facilitate a narcotics felony in violation of 21 U.S.C. § 843(b); and (4) Aiding and Assisting the preparation of a false tax return in violation of 26 U.S.C. § 7206(2).

2. Fed.R.Civ.P. 60(b) provides for Relief From Judgment of Order for reasons such as mistake, excusable neglect, newly discovered evidence, fraud, or "any other reason justifying relief from the operation of the judgment."

reinstate his pilot's license. The defendant, through his substitute attorney, claimed that when the AUSA stated at the plea hearing that "the government" would *not take any action* with regard to his pilot's license, he was led to believe that the Assistant United States Attorney meant to bind the entire United States Government, including the agency responsible for the issuance of his pilot's license, the FAA. The court disposed of the motion without a hearing, stating that Rule 60(b) was not the proper vehicle for this type of relief, but that the court still had jurisdiction to enforce the terms of the plea agreement. The judge reviewed and interpreted the agreement and the letters sent between the AUSA and defense counsel and found that "the written documents and court transcripts ... reveal that the term 'government' in the plea agreement clearly referred solely to the United States Attorney's Office [for the Northern District of Illinois]," and thus, did not bind the FAA. Rourke appeals the denial of his Rule 60(b) motion.

Before the appellate court had ruled on the merits of the defendant's 60(b) motion, Rourke filed a 28 U.S.C. § 2255 motion for collateral relief with the trial court, again arguing that the United States Attorney for the Northern District of Illinois breached its agreement with him when the FAA revoked his license. The district judge dismissed this claim as well, stating that he had previously ruled on the merits of this issue in the context of the Rule 60(b) motion and refused to revisit the issue on collateral review. He did, however, reiterate and make clear that he "interpreted the term, 'government' as referring only to the United States Attorney for the Northern District of Illinois." Rourke appeals the denial of his 60(b) motion as well as his § 2255 motion.[3]

## II. DISCUSSION

■ The issue on appeal is whether the United States Attorney for the Northern District of Illinois breached the plea agreement entered into with the defendant. Rourke argues that when the AUSA stated at the plea hearing that "the government" promised *not to take any action* regarding

his pilot's license, the term "government" unambiguously referred to the entire United States Government, covering all its agencies and departments, including the FAA. Rourke further contends that he reasonably expected that when he entered into the plea agreement, that it would bind "the government" and its agencies, and that he was induced to enter into the agreement because of the AUSA's reference to the "the government" and its promise to *take no action* with respect to his license.

■ "[T]he interpretation of disputed terms in a plea agreement should be determined by the district court ... [and] should be set aside only if clearly erroneous." *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985). A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ "Plea agreements are contracts, and their content and meaning are determined according to ordinary contract principles." *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1616, 123 L.Ed.2d 176 (1993) (citations omitted). However, plea agreements

> are unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's right to fundamental fairness under the Due Process Clause. [B]oth to protect the plea bargaining defendant from overreaching by the prosecutor and to insure the integrity of the plea bargaining process, the most meticulous standards of both promise and performance must be met by [the government].

*Id.* (citations and quotations omitted, alterations in original).

■ "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such

---

**3.** The court consolidated the defendant's appeals for review.

promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 264, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). We have made our position clear, however, that the *"Santobello* Court did not hold that the government must fulfill every agreement or offer it makes. Rather, as we have consistently recognized, the Court was concerned with enforcing governmental promises that had induced the defendant to plead guilty." *United States v. Traynoff,* 53 F.3d 168, 171 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 327, 133 L.Ed.2d 228 (1995) (citations omitted).

In *United States v. Ataya,* 864 F.2d 1324, 1330 (7th Cir.1988), we stated that when interpreting provisions of plea agreements "we in no way retreat from or otherwise modify the strict duty on the government to exercise due care in drafting plea agreements and in fully complying with agreements once accepted by the court." "The Government is to be held to the literal terms of the plea agreement," *id.,* and "may not rely on favorable judicial construction to cure significant ambiguities in its plea agreements." *Fields,* 766 F.2d at 1168 (quotation omitted). However, "not every dispute arising over the meaning of a plea agreement must be construed against the government for disputed terms ... are to be determined by the district court by objective standards." *Ataya,* 864 F.2d at 1331 (quotation omitted, alteration in original).

We believe that the AUSA's use of the term "the government" at the plea hearing was not as specific as it might have been, thus ill-advised, and in a given circumstance, might well be interpreted to refer to and include each of the governmental agencies involved. This case does not present such circumstances, for the correspondence between the AUSA and defense counsel just days after the plea hearing, which are part of the record, makes clear that the parties understood the agreement to bind only the Office of the United States Attorney for the Northern District of Illinois and the defendant.

■ We interpret the agreement using objective standards, *Ataya,* 864 F.2d at 1331, and rely on the language of the agreement itself, any contemporaneous documents that clarify its meaning, and the attorneys', the defendant's and the trial judge's understanding of the agreement. We refuse to rely solely on the defendant's assertions as Rourke would have us do, for "[i]t is well established ... that a defendant's belief as to the scope of the plea agreement does not control the scope of the agreement." *United States v. Caporale,* 806 F.2d 1487, 1517 (11th Cir.1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987) (citations omitted).

As the trial court did, we refer to the AUSA's letter to Rourke's attorney the day after the plea hearing, memorializing the terms of the plea agreement. In explicit terms, the letter recited that the "United States Attorney further agreed to *take no action* with respect to your client's aircraft pilot's license." In response, Rourke's counsel wrote the AUSA on May 11, 1984, clarifying certain aspects of the work-release portion of the plea agreement, but, significantly, made no reference to the U.S. Attorney for the Northern District of Illinois' pledge to *"take no action"* regarding Rourke's pilot license. He further stated and made clear that "[i]n all other respects *I agree with the plea agreement as outlined in your letter,"* (emphasis added), stating that at the time the plea was entered into, some nine years before Rourke filed his motions with the sentencing court, his counsel believed that the plea agreement bound only the defendant and the United States Attorney for the Northern District of Illinois. All the defendant offers to contradict both his original trial counsel's,[4] the court's, and the AUSA's understanding of the agreement, are his own declarations as to its scope and his equally self-serving assertion that he never would have entered into the agreement had he thought that the FAA was not bound by it.

■ It is interesting to note that even in his appellate brief, which was filed with this

4. On appeal, Rourke was represented by counsel other than the attorney he had during the plea negotiations referred to herein. It is interesting

to note that the same attorney who represented Rourke in the case before us, represented him in similar cases in Virginia, Oklahoma and Illinois.

court ten years after the defendant knowingly entered into the plea agreement, Rourke does not attempt to dispute the AUSA's and his trial counsel's understanding of the scope of the agreement, as reflected in their correspondence with each other. Instead, he argues, in his attempt to persuade us that we should not rely on those letters, that "extrinsic evidence is inadmissible to prove the meaning of a contract that is unambiguous on its face." *Ingram,* 979 F.2d at 1184. Although Rourke maintains that the term "government" unambiguously refers to the entire federal government, we note that within the criminal justice system throughout the country, the term "the government" is widely used and understood to refer to the "prosecution," or "the United States Attorney." Thus, the meaning of the term "government" is not as clear, definite and specific as the defendant would like us to believe and as a result, the district court properly turned to extrinsic evidence (letters) to assist in the interpretation of the plea agreement. *Id.*

It is well-settled law that contracts are construed in their entirety and all provisions in a contract must be harmonized in order that none are rendered meaningless. *Ataya,* 864 F.2d at 1335. At the time of the plea agreement, the AUSA stated that: (1) "the government" would not oppose work release; (2) "the government" would oppose straight probation; and (3) "the government" would *take no action* with respect to his license. Reading the three provisions together, it is obvious that the term "government" refers solely to the U.S. Attorney for the Northern District of Illinois, for only the U.S. Attorney could properly object to Rourke's conditions for work release and/or straight probation.

It should also be noted that the defendant was represented by counsel at the plea hearing, and during the hearing, in open court,

the judge specifically inquired of him as to whether or not he was "satisfied with [defense counsel's] representation during the course of this six-month period [when charges were pending against you]," and he answered "yes." After the AUSA stated facts sufficient to establish the charge and recited the terms of the plea agreement, the judge asked Rourke "Is that your understanding?" The defendant again responded "Yes." At this time, neither the defendant nor his attorney raised any objections to the plea agreement, in spite of the fact that that the agreement was read in open court by the judge to ensure that all the parties understood its clear and unambiguous terms. It is rather surprising that Rourke is now arguing that an ambiguity exists, eight years after he accepted all of the agreement's terms. He makes this argument in spite of his clear and definitive responses to the contrary at the plea hearing as well as his counsel's letter of May 11, 1984 (one week after the plea hearing) written to the United States Attorney's Office for the Northern District of Illinois.

Furthermore, when queried by the court at the conclusion of the plea hearing, the defendant also stated that the agreement, as summarized by the AUSA, was the only agreement he entered into with respect to this case, thus contradicting his argument that the agreement bound the FAA. As in *Ataya,* the "defendant, with the aid of effective counsel, entered a plea agreement with the government and, when squarely questioned by the court if he understood and accepted the terms of the agreement, stated under oath that he intended to be bound by that agreement." 864 F.2d at 1332. This court held Ataya to the terms of his plea agreement, and we do the same in Rourke's case.[5]

---

5. We note that our holding is consistent with the Second Circuit which has held that "[a] plea agreement binds only the officer of the United States Attorney for the district in which the plea is entered *unless it affirmatively appears that the agreement contemplates a broader restriction." United States v. Annabi,* 771 F.2d 670, 672 (2nd Cir.1985) (citing *United States v. Alessi,* 544 F.2d 1139, 1154 (2nd Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976)); *United States v. Papa,* 533 F.2d 815, 823–25 (2nd Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976) (emphasis added); *see also United States v. Abbamonte,* 759 F.2d 1065, 1072 (2nd Cir.1985) (observing that a plea agreement stating that "the government" agreed that the plea covered all charges that could have arisen out of the facts of the case bound only the United States Attorney's Office that entered into the agreement). From the transcript of the plea hearing, and the correspondence between the AUSA and defense counsel contemporaneous with the plea agreement, it is clear that the

Rourke attempts to rely on cases from other circuits in support of his proposition that the use of term "the Government" in a plea agreement binds all governmental agencies, including the FAA, to that agreement's terms, *Margalli–Olvera v. I.N.S.*, 43 F.3d 345 (8th Cir.1994); *United States v. Harvey*, 791 F.2d 294 (4th Cir.1984); *Thomas v. I.N.S.*, 35 F.3d 1332 (9th Cir.1994), but those cases are distinguishable from the case at hand. In *Margalli–Olvera*, the court examined a provision of a written plea agreement which provided: "if the defendant participates fully and truthfully in a debriefing, ... the United States will recommend against deportation. Otherwise, the United States will remain silent regarding deportation." 43 F.3d at 348. The issue was whether the term "United States" included the Immigration and Naturalization Service ("INS"), or if it only bound the Office of the United States Attorney which entered into the plea agreement with the defendant. The court noted that because "[d]eportation proceedings are explicitly referred to in the same sentence that uses the term 'United States,'" and "[g]iven that the INS conducts these proceedings, the plain language of this sentence contemplates the silence of the INS." *Id.* at 352. Furthermore, the Eighth Circuit also ruled that the United States Attorney has the authority to bind the INS to the terms of a plea agreement, which added support to its holding that the plea agreement bound the INS. *Id.* at 353–54. *Margalli–Olvera* is distinguishable from the case at bar for two reasons: (1) the United States Attorney for the Northern District of Illinois is without jurisdiction to bind the FAA (which will be discussed *infra*), and (2) the court in *Margalli–Olvera*, in reaching its decision, was unable to refer to any extrinsic, contemporaneous evidence (correspondence between government attorneys and defense counsel) regarding the scope of the agreement and the parties' intent when entering into it, unlike the district court in this case.

In *Harvey*, once the court found that the term "the Government" in a plea agreement was ambiguous, it held that it was required to construe the agreement against the government because there was no extrinsic evidence to guide the court's interpretation of the term. 791 F.2d at 303. We find no basis and thus refuse to construe Rourke's plea agreement against the government, however, because the letters between the AUSA and Rourke's trial counsel make it clear that the United States Attorney for the Northern District of Illinois, speaking only for his office, made the promise to refrain from taking any action with respect to the defendant's pilot's license.

The final case that Rourke relies upon concerns a plea agreement that bound the INS. *Thomas*, 35 F.3d at 1332. The written plea agreement disputed in *Thomas*, unlike Rourke's agreement, was definite and acceptable because it specifically stated that the "Government will not oppose any motions made by your counsel for ... relief from deportation to the ... U.S. Immigration Service," and the agreement elucidated and defined the term "Government" to include "*its departments, officers, agents, and agencies.*" 35 F.3d at 1335–36, n. 1, 1338 (emphasis added). Indeed, even the United States Attorney in *Thomas* informed the INS by letter that the text of the plea agreement "may suggest" that the INS was bound by the agreement's terms. *Id.* at 1336. Significantly, as in *Margalli–Olvera*, the court in *Thomas* specifically held that the United States Attorney had the authority to bind the INS, as contrasted to Rourke's case, where the United States Attorney for the Northern District of Illinois is without jurisdiction much less authority to bind the FAA in plea agreements. *See*, *infra*. *Thomas* also held that the plea agreement "bound '[t]he Government,' so defined, not to oppose motions for 'relief from deportation' ... [which] are made and heard before the INS, and opposed by INS lawyers," and that if this promise was to have any meaning, it "had to mean that the INS would not oppose such a motion." *Id.* at 1338. In contrast, the language in Rourke's plea agreement entered in the Northern District of Illinois is barren of a

parties did not "affirmatively contemplate" that the entire United States Government would be

bound by Rourke's plea agreement.

specific, albeit expansive definition of the term "Government" such as found in the *Thomas* plea agreement (stating that "government" includes its "departments, officers, agents, and agencies").

The fact that it took Rourke eight years from the revocation of his license to bring his claim of a breached agreement is indicative of the substitute counsel's newly discovered ingenious argument, for a reading of the record reveals that Rourke never contemplated much less alleged that the entire federal government would be bound by the plea agreement at the time he entered into it. The FAA's revocation letter (July 1986) related that Rourke's license was suspended indefinitely, but he could re-apply after August 11, 1987. Although the record is silent as to whether Rourke reapplied for his airman's certificate or not, we can only assume that he did and his application or applications were denied. Thus, eight years after Rourke's revocation, substitute counsel alleged on Rourke's behalf that the terms of his plea agreement in the Northern District of Illinois had been breached.

In the case before us, the AUSA promised that the United States Attorney for the Northern District of Illinois would *take no action* with regard to the defendant's license, and he kept that promise, but it should be made clear that he made no guarantees that Rourke's license would not be impaired. Rourke has failed to produce any evidence to suggest that the United States Attorney's Office in the Northern District of Illinois took any action by sending the FAA any communication notifying them of his conviction, much less a copy of Rourke's conviction, or that they alerted the FAA in any manner. In Rourke's file with the FAA, there was a press release detailing the defendant's conviction in Illinois, but the conviction was a matter of public record, which the FAA may have in all probability discovered on its own.

Thus, we hold that Rourke's claim that the United States Attorney for the Northern District of Illinois breached the plea agreement is without merit, for the AUSA promised that no one from that office would *take any action* with regard to his license, and from this record, no one did; we are convinced the FAA acted independently.

In support of his contention that the agreement was breached, Rourke relies on the language from *United States v. Cook.* 668 F.2d 317 (7th Cir.1982). In *Cook,* the defendant entered into a plea agreement where the government promised to "make no recommendation whatsoever as to any possible punishment," and to "not offer anything at all in *aggravation."* However, the government turned over its entire case file to the probation office for the preparation of a presentence report and sentencing recommendation, including unsubstantiated and damaging information. For example, the case file contained statements from a codefendant that defendant Cook sold seven to eight pounds of marijuana daily at Cook's cocktail lounge and pool room. Further, the case file included opinions that the cocktail lounge was a major distribution center for drugs in the area. *Id.* at 318–19. Although the defendant's prior convictions were part of his criminal record and available to those in the criminal justice system, including the court, probation office, prosecutor, and defense counsel, the unsubstantiated observations regarding the defendant's drug trafficking, certainly "aggravating" evidence, were not a matter of public record. The government in *Cook* promised not to submit "aggravating" material to the district court for sentencing, and it broke that promise by submitting aggravating material to the probation office for the presentence report. *Id.* at 320.[6] The instant case is distinguishable from *Cook* because in *Cook,* the United States Attorney's Office's actions

---

6. The specific issue in *Cook* is not present in Rourke's case; the May 2, 1984 letter from the AUSA confirming Rourke's plea agreement stated that "the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing." Additionally, we note that the government is not authorized to withhold relevant information from the sentencing court. *See e.g.* U.S.S.G. § 1B1.8, comment. (n. 1) (government not authorized to withhold information from the sentencing court even where defendant provides self-incriminating information pursuant to a cooperation agreement).

ensured that the information it promised not to bring to the sentencing judge's attention, reached him through the vehicle of the presentence report. In Rourke's case, the United States Attorney for the Northern District of Illinois kept his promise and *took no action*, direct or indirect, with respect to the defendant's license.

We also observe that Rourke has failed to establish that the AUSA's promise *not to take any action* regarding his license induced him to plead guilty in the Northern District of Illinois, as required by *Santobello.* 404 U.S. at 264, 92 S.Ct. at 499–500; *see also Traynoff,* 53 F.3d at 171. Although Rourke claims that the U.S. Attorney's promise in the Northern District of Illinois induced his plea, Rourke plead guilty to drug-trafficking crimes in the Eastern District of Virginia (shortly after entering into the Illinois agreement), without any pledge by the prosecutor in Virginia that Rourke's license would be safeguarded. It is interesting to note, as we pointed out earlier, that Rourke waited eight years from the date of the FAA's revocation before asserting that the plea agreement in the Northern District of Illinois had been breached.

Assuming, *arguendo,* that we were to hold that the plea agreement was breached, Rourke is without a remedy. Rourke attempts to rely on *United States v. Bowler* for the proposition that this court can order specific performance of the provisions of a plea agreement in appropriate circumstances. 585 F.2d 851, 856 (7th Cir.1978). In *Bowler,* we did hold that where a United States Attorney breaches a plea agreement, courts have wide discretion to fashion appropriate remedies. *United States v. Bowler,* 585 F.2d 851, 856 (7th Cir.1978). Expounding on *Bowler* in *United States v. O'Brien,* we stated that "[d]epending on the circumstances of the individual case, such relief may include allowing the defendant to withdraw his or her guilty plea, directing specific performance of the plea agreement, or ordering the imposition of a specific sentence if neither of the above options would provide an appropriate remedy." 853 F.2d 522, 525–26 (7th Cir. 1988). We examine each remedial option in turn.

In his appellate brief the defendant requested this court to order the government "to provide specific performance of its promise, or in the alternative the defendant should be allowed to withdraw his guilty plea." However, during oral argument, the panel called defense counsel's attention to the fact that if the plea is set aside, and Rourke is given a new trial, convicted and re-sentenced, although his offenses were committed before the institution of the Sentencing Guidelines, the Guidelines might influence the new penalty assessed against the defendant, and Rourke's sentence might very well be more severe than probation and community service. Rourke's attorney responded that "I don't believe that vacating the plea and going back to the starting point is fair to the defendant," and that "our preferred remedy at this point is for the government to honor its promise and give back the license." Thus, Rourke, through his counsel, has waived his right to ask the court to allow him to withdraw his guilty plea.

Second, the defendant has failed to provide us with statutory authority or case law in support of his contentions that an AUSA can bind the FAA to the terms of a plea agreement, or that this court has jurisdiction over the FAA's licensing of pilots, or that we can order the Federal Aviation Administration to reinstate his license. At oral argument, the panel made clear that no such authority exists. Furthermore, he has failed to produce evidence to suggest, much less confirm, that the plea negotiations contemplated binding any entity other than the United States Attorney for the Northern District of Illinois. In his brief, Rourke properly acknowledges that only the FAA has the power to revoke his license and that he was aware of this fact, yet he simultaneously, and without citation of authority, attempts to argue that this court has the authority to dictate to the FAA that it must reinstate his license.

Finally, and most importantly, the FAA's June 5, 1986 letter to defense counsel made clear that it would revoke the defendant's license based on his May 3, 1985 drug conviction in the Eastern District of Virginia, as it was statutorily authorized to do, 49 U.S.C. §§ 44710(b)(1)(A) & (B):

the Assistant United States Attorney who represented the United States in the prosecution of Mr. Rourke in the United States District Court in the Eastern District of Virginia, Norfolk Division, did not [promise to refrain from taking any action with respect to the defendant's pilot's license]. We could use the Virginia conviction as a basis for revoking Mr. Rourke's certificates.

Furthermore, Rourke was convicted of drug related offenses in the Northern District of Oklahoma. Although the AUSA in Oklahoma carefully crafted a plea agreement which stated that "the United States Attorney's Office for the Northern District of Oklahoma agrees that it will not initiate nor urge the FAA to initiate any proceedings concerning the status or revocation of your client's license to fly aircrafts," this provision likewise in no way limited the FAA's ability to revoke Rourke's license should it discover the convictions on its own.[7]

We also note that the same attorney represented Rourke in Illinois, Virginia, and Oklahoma, and he negotiated plea agreements contemporaneously in each jurisdiction. The fact that the Oklahoma plea agreement specifically binds only the U.S. Attorney for the Northern District of Oklahoma, excluding the FAA, serves as further evidence that Rourke and his counsel were well aware in November 1985 (the date of the Oklahoma plea agreement) that the United States Attorney's Office was only making a promise on behalf of that individual jurisdiction. Thus, even if there was any scant ambiguity as to the scope of the agreement in the Northern District of Illinois, the fact that the AUSAs in Virginia and Oklahoma refrained from making any promises on behalf of the FAA demonstrates that Rourke could not have harbored the illusion that the United States Attorney in the Northern District of Illinois made any such pledge for the FAA.

The defendant is essentially requesting that we order the modification of the terms of his plea agreement, but we decline the invitation. The AUSA and defense trial attorney understood the agreement to bind only the defendant and the United States Attorney's Office for the Northern District of Illinois. The United States Attorney for the Northern District of Illinois promised to *take no action* with respect to Rourke's license, and he abided by his pledge. Rourke waited eight years after the revocation of his license to retain substitute counsel and assert that the FAA was bound by the agreement. Thus, the plea agreement was not breached and the district court's denial of Rourke's Fed.R.Civ.P. 60(b) and 28 U.S.C. § 2255 petitions for relief are

AFFIRMED.

BAUER, Circuit Judge, concurring.

I concur. Only one reason exists for my joining the majority: there is no way this court can give the appellant the relief he seeks. The last thing he wants is an opportunity to withdraw his plea of guilty. What he wants is his pilot's license returned by the FAA. This we have no power to require—the FAA is not a party to these proceedings—nor would I rush forward to sign such an order if the agency were a party.

Having said that, I doubt the premise that it is widely known that "the government" means the U.S. Attorney or the Department of Justice. It is true that the U.S. Attorney's Office couldn't prevent the FAA from revoking the appellant's license, but that fact is not common knowledge; the Department of Justice represents just about every branch and cranny of the Federal government and frequently speaks in the name of the agencies or branches it represents.

Plea agreements should be precise. If the prosecutor undertakes to use his best offices to keep the FAA from revoking a license, the plea agreement should say just that. When the plea agreement says that "the government will do" or "not do" this or that, I do not believe that the bargainer must engage in research to ascertain whether or not the

---

7. Thus, the Oklahoma or Virginia convictions also could have served as a basis for revocation of the defendant's license, in spite of the fact that there was no evidence in the record that either the U.S. Attorney for the Northern District of Oklahoma or Eastern District of Virginia made the FAA aware of Rourke's convictions.

812

prosecutor can legally deliver on such a promise.

If the fact that the U.S. Attorney couldn't live up to the commitment that the government would take no action with respect to Mr. Rourke's pilot's license was known to the prosecutor, then the statement was both misleading and too clever by half; if the inability to deliver was unknown to the prosecutor, why should we assume or believe that Rourke or his lawyer should have been aware of that fact?

So I concur with a small regret that Rourke has suffered a wrong without a remedy that this court can repair.